Argued and submitted June 13, reversed and remanded August 8, 1990

Wanda L. DRYDEN,
*Appellant,*

*v.*

STATE ACCIDENT INSURANCE
FUND CORPORATION,
*Defendant,*

James William GORDON,
*Respondent.*

(85-1807; CA A61014)

796 P2d 397

William B. Wyllie, Salem, argued the cause and filed the brief for appellant.

James C. Edmonds, Salem, argued the cause for respondent. With him on the brief were Michael C. McClinton and Clark, Lindauer, McClinton, Krueger, Fetherston & Edmonds, Salem.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

EDMONDS, J.

## EDMONDS, J.

This case is before us for the second time. In our first opinion, we held that, because plaintiff's punitive damages claim alleged an intentional tort against Dryden (defendant) personally, outside the scope of the Oregon Tort Claims Act (OTCA), ORS 30.260 *et seq*, the trial court erred in striking the claim on the ground that punitive damages are not recoverable under OTCA. *Dryden v. SAIF*, 88 Or App 542, 746 P2d 240 (1987).[1] On remand, the trial court, relying on *Brungardt v. Barton*, 69 Or App 440, 685 P2d 1021 (1984), granted defendant's motion for a directed verdict at the close of plaintiff's case, ruling that the jury was not entitled to conclude from the evidence that defendant was acting outside the scope of his employment or that plaintiff had complied with the notice requirements of the OTCA.

Plaintiff appeals and argues that there was testimony at trial from which the jury could have concluded that defendant was acting outside the scope of his employment, that as a result plaintiff did not have to comply with the notice requirements of OTCA and that the trial court, therefore, erred in granting defendant's motion. Viewing the evidence in the light most favorable to plaintiff, *Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984), we agree and reverse.

Defendant had plaintiff under surveillance as part of his job as an investigator employed by SAIF. As plaintiff was driving her car, she and her daughter, who was a passenger, noticed that defendant was following them in another car. After both cars pulled off the road and parked, plaintiff confronted defendant. Plaintiff's daughter testified:

"A: * * * And my mom got out. She was upset and angry, scared. I was scared. Didn't know who this guy was. And she asked him what he was going, [*sic*] why he was following us, and I guess he didn't answer. I don't know. I was in the car.

"Q: You didn't hear any answer, anyway?

"A: No.

"Q: What did he do then?

"A: Well, after she asked him all that, she went around to

---

[1] We also held that the court did not err in entering judgment in favor of defendant State Accident Insurance Fund Corporation.

the front of the car and yelled to me to get his license plate, and she did have her hands on the car, and *evidently he panicked or something, 'cause he did go forward before he went back and went around her then after he went backwards,* and it did hurt her, her shins.

"Q: And —

"A: And she went up over the car and held herself up by her hands.

"Q: In other words, she was sort of spread-eagled over the hood of the car?

"A: Just — yeah.

"Q: Did she get herself off there?

"A: Yeah.

"Q: And then he left?

"A: Well, he backed up and then went around, yeah.

"* * * * *

"Q. And when your mother got out, you remained in the car?

"A. Yes.

"Q. She was loud?

"A. Very.

"Q. She was swearing?

"A. Yes.

"Q. She was threatening?

"A. I didn't hear her threaten nothing. She just wanted to know who he was.

"Q. Waving her fists around?

"A. Well, she was upset, yeah.

"Q. And you indicated to me before that he looked scared inside his car —

"A. Yes.

"Q. — Isn't that correct?

"A. Yes.

"Q. In fact, you told me he was actually cowering in his seat?

"A. Well, he looked scared, yes, nervous." (Emphasis supplied.)

Plaintiff testified:

"Q. You claim that [defendant] ran into you with his car?

"A. Yes. He did."

Defendant testified:

"Q. * * * how did you feel?

"A. *Well, at first I knew that [plaintiff] knew that I was following her, that my, might say, cover was blown, that — and I was first mad at myself that I got caught, I guess, for following her, and I knew that it would be very difficult then to find out what her activities would be at that point forward.*

"Q. When she got out of her car, was she loud?

"A. Very, very excited, very, might say, irrational.

"Q. Was she swearing?

"A. Yes, she was.

"Q. Was she threatening?

"A. Yes, she was.

"Q. Did she appear angry?

"A. Yes.

"Q. How did you feel?

"A. Well, I was very nervous and, you might say, almost scared. My past experience as a police officer coming into contact with people like this, I didn't know what to expect from her at that point forward.

"* * * * *

"Q: You said that you were told to avoid contact with these people that you were — that you had under surveillance; am I correct about that?

"A: That's correct. I knew that since [plaintiff's] workers' comp claim was coming to a hearing in a month or so, I knew she was represented by an attorney, and we were not to have any physical or verbal type of contact with her.

"* * * * *

"Q: * * * I'm not sure that you answered that correct — that question the way you meant to. [The question was:] 'Was there no way possible that you could leave without hitting [plaintiff]?'

"A: *Oh, if I would have put my car in drive and drove forward, sure, I would have hit her, but I didn't do that.*

"Q: What did you do?

"A:   I put my car in reverse and backed up and then tried to drive around to the left to go around her, and then she — I was driving at approximately one or two miles per hour. *As I start — I backed up, then started to pull forward around her. As I did that, she stepped in front of my vehicle again, causing me to stop.*

"Q:   You had to repeat the process, then?

"A:   Had to repeat the process. She finally left, moving back over to her vehicle, and that enabled me to — I still swung out a little bit to leave the area.

"Q:   Ever come into contact with her at all?

"A:   Never." (Emphasis supplied.)

In *Brungardt v. Barton, supra,* we stated:

"In order to determine whether [a] defendant's actions fall within the scope of his employment, we consider whether the act in question is of a kind he was hired to perform, whether the act occurred within the authorized time and space and whether the employe was motivated, at least in part, by a purpose to serve the employer." 69 Or App at 443, *citing Stanfield v. Laccoarce,* 284 Or 651, 655, 588 P2d 1271 (1978).

As a general rule, whether a particular act is within the scope of employment is to be decided by the trier of fact. Not every intentional tort by an employee is outside the scope of employment. The intentional use of force may be authorized expressly or by the circumstances. However, an intentional tort may also be a private act outside the scope of employment if the employee is motivated by other than an intention to serve the employer. *See Thomas v. Parker Refrigerated Services, Inc.,* 61 Or App 234, 239-40, 657 P2d 692, *rev den* 294 Or 792 (1983).

■ ■   A motion for a directed verdict may be granted if there is only one reasonable conclusion that can be drawn from the evidence. *James v. Carnation Co.,* 278 Or 65, 69, 562 P2d 1192 (1977). Here, the jury could have found from the testimony that defendant drove forward and hit plaintiff with his car. The jury could have inferred that that act was either intentional or negligent. If it was intentional, it may have been outside defendant's scope of employment, depending on his motivation. The jury was entitled to draw an inference that defendant intentionally struck plaintiff and acted out of anger, because his "cover had been blown," and without

intending to benefit his employer. The trial court erred in granting his motion for a directed verdict.

Reversed and remanded.